**UNITED BRANDS COMPANY, Plaintiff,**

v.

**INTERMEDIATE CREDIT CORPORA-TION and Metals Holding Corporation, Defendants.**

**No. 75 Civ. 6034 (HFW).**

United States District Court,
S. D. New York.

Jan. 10, 1977.

of guaranty are void as to Intermediate for lack of consideration; (2) that the contract of guaranty is so ambiguous and unconscionable that enforcement should be denied; (3) that acquiescence in any default of Metals or representations by United prevent it from asserting a claim against Intermediate as a matter of estoppel or waiver; and (4) that there has been an accord and satisfaction. Second, Intermediate contends in its papers in opposition to the instant motion that it has fully performed; that Metals was never given due notice of default; and that United has not supported its motion on the basis of admissible evidence adduced from persons with knowledge of the facts.

Chadbourne, Parke, Whiteside & Wolff, New York City by Donald I. Strauber, Richard J. Ney, Paul J. Ostling, New York City, of counsel, for plaintiff.

Satterlee & Stephens, New York City by Henry J. Formon, Jr., John T. Schmidt, New York City, for Intermediate Credit Corp.

## OPINION

WERKER, District Judge.

This action arises out of an agreement which renegotiated the terms of a defaulted debt instrument. Plaintiff United Brands Company ("United"), as a creditor of defendant Metals Holding Corporation ("Metals"), has made a motion under Rule 56 of the Federal Rules of Civil Procedure for summary judgment against co-defendant Intermediate Credit Corporation ("Intermediate"), which it seeks to hold liable as Metals' guarantor. United has not joined Metals in this motion.

Intermediate opposes the motion on numerous grounds. First, without adequate explanation, it relies upon nine affirmative defenses asserted in its answer to the complaint. These defenses may be summarized as follows: Intermediate contends (1) that the underlying agreement and the contract

## BACKGROUND

*Contractual arrangements.* In 1969, Marion Malleable Iron Works, Inc. ("Marion"), a wholly-owned subsidiary of Metals, purchased a foundry from the AMK Corporation ("AMK"). As part of the transaction, Marion gave AMK a note in the amount of $1,518,000 secured by a second security interest in Marion's machinery, equipment, land and buildings, and Intermediate lent Marion cash in return for an $850,000 note secured by an interest in Marion's real and personal property, as well as certain shares of Marion stock. Intermediate further agreed to purchase 200 shares of Marion common stock. The agreement between Marion and Intermediate expressly provided that the Intermediate security interest was subordinate to that held by AMK.

AMK was merged into United Fruit (now United) sometime during 1970. By June 26, 1973, Marion had defaulted on its note to AMK and therefore owed United, as the holder of that note, an unpaid principal balance of $1,312,557.07. At that time, it was also indebted to Intermediate in the amount of $740,746.57.

On June 26, 1973, United, Metals and Intermediate entered into an agreement (the "Agreement") whereby United sold the Marion note to Metals at a discount in return for Intermediate's written promise

to guarantee the transaction (the "Guaranty").[1]

The Agreement called for Metals to pay $900,000 for the Marion note. Of this sum, $500,000 was to be paid immediately, with the remaining $400,000 due in quarterly installments payable within 45 days after the end of each quarter of Marion's (calendar) fiscal year ("FY"). Payments were to begin with the quarter ending September 30, 1973 and were to continue until March 31, 1978. Each installment was to be in an amount equal to eight percent of Marion's pre-tax earnings for the prior quarter and, if eight percent of Marion's annual pre-tax earnings proved to be greater than the sum of the quarterly payments, Metals was obligated to pay United the difference. Moreover, if the entire $400,000 had not been paid by the end of the last contract quarter, the difference was due on June 30, 1978. The Agreement also provided for the assessment of interest on the outstanding balance until the full $400,000 was paid.

Paragraph 8 of the Agreement states, in part, that

"The entire unpaid balance . . . including accrued interest may be declared to be immediately due and payable upon fifteen (15) days written notice from United upon the happening of any one of the following events of default:

. . . . .

d. Default by Metals in the performances of [sic] observance of any of the representations, warranties, covenants, conditions or agreements other than with regard to payments of principal and interest to be made by Metals pursuant to the terms hereof and such default shall have continued for a period of thirty (30) days or fifteen (15) days after written notice by United, whichever is earlier. . . . "

As long as any portion of the $400,000 remained unpaid, Metals was required by

paragraph 9 of the Agreement to deliver to United:

"a. As soon as reasonably possible and in any event, within 120 days after the close of each fiscal year of Marion, a balance sheet of Marion and its subsidiaries, if any, as of the end of such fiscal year, and a statement of income (loss) and retained earnings (deficit) for such fiscal year all in reasonable detail and certified by Marion's independint [sic] auditors.

"b. As soon as reasonably possible and in any event, within forty-five (45) days after the close of each fiscal quarter of each fiscal year of Marion, copies of the balance sheet of Marion and its subsidiaries, if any, as of the end of each quarter, and the statement of income and retained earnings of Marion and its subsidiaries, if any, for such quarter, in reasonable detail, by the treasurer or assistant treasurer of Marion."

The Guaranty provides that Intermediate "absolutely and unconditionally guarantees to United the full performance and observations [sic] of all the covenants, conditions and agreements provided in the Agreement to be performed and observed by Metals." It also states that it is "an unconditional and absolute guaranty of performance and payment" and that

". . . if for any reason an[y] duty, agreement or obligation of Metals contained in the Agreement shall not be performed or observed by Metals, or if any amounts or any part thereof payable under or in connection with the Agreement shall not be paid promptly when due and payable, [Intermediate] will promptly perform or cause to be performed each of such duties, agreements and obligations and will forthwith pay such amounts to the holder hereof, regardless of any defense or set-off or counterclaim which Metals may have or assert . . . "

---

1. Although Intermediate correctly observes that United's relinquishment of its prior security interest in the assets of Metals was not expressly part of the consideration for the Agreement of June 26, 1973, United did assign its interest in Marion's machinery and equipment (and proceeds thereof) to Metals and Intermediate on that date.

Under the express terms of the Guaranty, Intermediate waived any requirement that United "first make demand upon, or seek to enforce remedies against Metals" before demanding payment from Intermediate. Intermediate also waived any right to advance notice of "the breach or nonperformance of any duty, agreement or obligation of Metals contained in the Agreement."

[1] Both the Agreement and the Guaranty prohibit any modification without United's written consent.[2]

*Subsequent events.* United contends that Metals failed to provide the financial information required by paragraph 9 of the Agreement, that it was therefore entitled to accelerate payment of all outstanding principal and interest upon notice to Metals and that, having done so, it can look to Intermediate as a guarantor of payment without first attempting to recover the unpaid balance and interest from Metals. Intermediate denies that Metals was in default and consequently contends that it presently has no obligation to pay the sums claimed by United.

According to the complaint, as of August 29, 1975 Metals had not submitted the required financial information for Marion's fiscal year ending December 31, 1974, the fourth quarter of FY 1974 and the first quarter of FY 1975. While the complaint also alleges that United has not received the payments owed for each of these quarters, that claim appears to have been abandoned at this stage of the litigation. Indeed, the record indicates that Marion is unlikely to have any pre-tax earnings prior to March 31, 1978. Thus, unless United is permitted to accelerate payment of Metal's obligation, it is probable that it will not be able to recover any portion of the unpaid balance prior to June 30, 1978.

In order to understand the contentions of the parties, it is necessary to review their dealings beginning with FY 1973.

Although Marion's financial data for the fourth quarter of FY 1973 was due, according to the Agreement, within 45 days after the close of the quarter, Metals never submitted a separate financial report for that period inasmuch as Marion's annual financial report for that year, certified by Arthur Andersen & Company, contained the necessary information. In order to permit the submission of one year-end report, in a letter dated February 12, 1974, United had agreed, by its Vice President G. Burke Wright, to extend the fourth quarter reporting period for an additional sixty days.[3] Since the letter was signed by an officer of United and undoubtedly met the requirement that modifications of the Agreement were to be in writing, Metals had 105 days after the close of the fourth quarter in which to deliver its report. The annual report was actually sent on April 23, 1974, more than 105 days after the close of the fourth quarter of FY 1973, but within the 120 day-period for the submission of an annual report. However, United Does not suggest in its complaint that this constituted a breach of the Agreement.

At the end of FY 1974, United received a certified annual financial report but, again, no fourth quarter report was sent. Nevertheless, it is clear from the record that this submission was timely as both a fourth quarter and a year-end report if Wright's February, 1974 letter also applied to the deadlines for FY 1974. However, unlike the certified financial report for FY 1973, it is far from clear that the report for FY

---

**2.** Both documents also state that they are to be construed in accordance with New York law. Thus, a change could only be made by an executory agreement if it was "in writing and signed by the party against whom enforcement of the change is sought or by his agent." New York General Obligations Law § 15–301(1) (McKinney 1964).

**3.** The text of the letter was as follows:
"This will confirm my telephone conversation today with Le̲ ̄ Boren relating to au-

dited year-end financial statements from Marion Malleable Iron Works, Inc.
". . . We can understand the need for a few days extension in preparation of an audited statement, and you may consider this as our agreement to extend for 60 days the payment and financial statements ordinarily due to reach us 45 days after the end of each calendar quarter."

1974 met the other requirements of the Agreement.

After the Agreement was signed, Metals sold all of Marion's common stock to the Avis Industrial Corporation ("Avis"). Accordingly, Arthur Andersen & Company noted in the audited Marion report for FY 1973 that Marion had been a subsidiary of Avis since July 1, 1973 and represented that:

"The financial statements [of Marion] present fairly the financial position [of Marion] at December 31, 1973, and the results of its operations and changes in its financial position for the six months then ended, in conformity with generally accepted accounting principles."

The submission for FY 1974 was captioned as follows:

*"AVIS INDUSTRIAL CORPORATION AND SUBSIDIARIES*

*CONSOLIDATED FINANCIAL STATEMENTS AS OF DECEMBER 31, 1974*

*TOGETHER WITH AUDITORS' REPORT"*

It contained a representation substantially similar to the one in the FY 1973 report, but also stated that:

"There are certain balance sheet and income and expense items which Avis does not allocate between the subsidiaries and divisions. Accordingly, the division and subsidiary financial information summarized in Note 11 to the financial statements, [Accounts of Divisions and Subsidiaries] does not purport to present financial position and results of operations of the separate entities."

Intermediate contends that "Marion's year-end financial status was incorporated within Avis' certified annual report for FY 1974 and served "in lieu" of a separate certified annual financial report for Marion." United maintains, however, that the Avis report was an unacceptable substitute which placed Metals in default under paragraph 8(d) of the Agreement.

Marion's financial data and payment for the first quarter of FY 1975 were due, according to the Agreement, on May 15, 1975, 45 days after the close of the quarter. If Wright's letter applied to this quarter as well, the deadline for the submission of these materials may have been extended for another 60 days but, in any event, it appears that they were not sent to United until September 18, 1975 at the earliest, more than 120 days after the deadline contained in the Agreement. In the meantime, before Intermediate submitted a report for the first quarter of FY 1975, United sent notice to Metals on August 29, 1975 that it was in default under the agreement "by reason of [its] failure to cause to be delivered . . . copies of financial reports as specified in Paragraph 9 a and b of the Agreement within the required times . . . ."[4] United also informed Intermediate of its letter to Metals and observed, in a cover letter, that Intermediate was "responsibly concerned" as the "guarantor of the Guaranty."

## DISCUSSION

 The only issue before the court is whether United has shown on undisputed facts that Metals was in default under the Agreement, thereby entitling United to recover on the Guaranty. If there are any material factual questions which remain to be resolved, summary judgment may not be granted. *See generally, Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir. 1975). I have concluded that there are several such questions in the in-

4. The notice was sent to Metals "c/o C.N. Bellm, 100 East 42nd Street (22nd Floor), New York, New York 10017," despite Metals' prior notice, in accordance with the Agreement, that future correspondence should be sent "c/o Chas. N. Bellm, Post House Road, Morristown, N.J. 07960." Intermediate argues that, for this reason, it cannot be liable under the accelera-

tion clause. However, Bellm admits that he received the notice on September 2, 1975. Notice to Metals itself was out of the question since Metals had been liquidated earlier that year after being sold to General George Olmstead, Chairman of the Board of Avis' parent company, International General Industries, Inc.

stant action and that, as a consequence, the motion for summary judgment must be denied.

First, I consider paragraph 8 of the Agreement, the so-called acceleration clause, to be ambiguous. By its terms, the "entire unpaid balance . . . may be declared to be immediately due" if Metals fails to perform or observe "any of the representations, warranties, covenants, conditions or agreements *other than with regard to payments of principal and interest*" for a period of 30 days (emphasis added). The question presented is whether the parties considered submission of the financial reports to be part of the payment terms at the time that they entered into the Agreement. If so, the reports fall within the underscored exception to the acceleration clause, and Metals could not default simply by failing to submit timely or adequate quarterly and annual financial statements. However, default is possible if the exception applies only to the tender of quarterly *payments* due United.

While this might appear to be a question of construction and, therefore, a matter for the court to resolve, it is the long-standing rule of this circuit that "contractual language . . . susceptible of at least two fairly reasonable interpretations . . . presents a triable issue of fact," *e. g., Aetna Casualty & Surety Company v. Giesow*, 412 F.2d 468, 471 (2d Cir. 1969), which entitles the parties to present evidence to the trier of fact. *Asheville Mica Corp. v. Commodity Credit Corp.*, 335 F.2d 768, 770 (2d Cir. 1964); *Grenader v. Spitz*, 390 F.Supp. 1112, 1120 (S.D.N.Y.1975) (intent is question of fact).

Second, even if it is assumed that late or insufficient financial statements could lead to a default, United has not shown as a matter of law that Metals did not perform its contractual obligations. Metals had to supply, at regular intervals, a balance sheet and statement of income and retained earnings for Marion and its subsidiaries, both of which were to be prepared, in "reasonable detail," by specified parties. It may be that the Avis consolidated financial report substantially complied with this condition of the Agreement once Metals merged with Avis. In part, the question is whether the Avis materials provided reasonable detail as to Marion; in resolving this issue at trial, it will be helpful to hear the testimony of accounting experts since exhibits annexed to the motion papers indicate that disagreement exists.[5]

Moreover, if it is assumed that the Avis reports were acceptable, as it must be in considering this motion, *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), United has not established that there is no factual dispute as to the timeliness of the reports.

The contract provides that:

". . . No modification, rescission, waiver, release or amendment of any provision of this agreement shall be made except by an agreement in writing signed by a duly authorized officer of United."

Accordingly, United will not be able to establish that Metals was in default at the time that notice was sent if the jury finds that Wright's letter of February 12, 1974 constitutes an amendment or modification applicable to all quarterly reporting periods and not the fourth quarter deadline alone (or, indeed, FY 1973 alone).[6]

---

5. As the court has already noted, the consolidated Avis report for FY 1974 states that, in the opinion of Arthur Andersen & Company, it *fairly presents*

"The financial position of Avis . . . and subsidiaries as of December 31, 1973 and December 31, 1974, and the results of their operations and the changes in their financial position for the years then ended . . ."

However, in light of the disclaimer as to information included in Note 11, a member of Price

Waterhouse & Company, United's independent public accountant, concludes that

"the report does not express an opinion on the financial position of Marion . . . and the results of its operations . . . based on an examination in accordance with generally accepted auditing standards."

6. *Intermediate also contends, without any reci-tation of authority, that United is bound by its oral agreement at an August 28, 1975 meeting to a "moratorium as to any attempted enforce-ment of the Agreement." While Intermediate

It is therefore evident that United's motion for summary judgment against Intermediate cannot be granted. In reaching this conclusion it has not been necessary for me to consider either the merit of Intermediate's numerous affirmative defenses or whether further material factual issues are present; thus, this opinion should not be taken as any indication of my view on these as yet unresolved questions.

SO ORDERED.

seeks to distinguish such a "moratorium" from modification of the Agreement itself, the argument is clearly futile under present New York law. *See* note 2 *supra*.